IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CORNELIUS MADDOX,

                Plaintiff,                    OPINION & ORDER

  v.                                                                  10-cv-831-wmc

PETER ERICKSEN, MARK S. STUTLEEN,
WENDY BRUNS, DENNIS MOSHER,
MALEAH CUMMINGS, and MARIA
AMARANTE,

                Defendants.

---

In this civil action brought pursuant to 42 U.S.C. § 1983, *pro se* plaintiff Cornelius Maddox alleges that defendants, employees of the Wisconsin Department of Corrections ("DOC"), violated his First Amendment rights by approving his transfer to the general population unit of the Wisconsin Secure Program Facility in retaliation for filing a lawsuit complaining about inadequate dental care at the Green Bay Correctional Institution. Both parties have moved for summary judgment. (Dkt. ##32, 40.) Because Maddox fails to proffer *any* evidence save related timing from which a reasonable jury could find a causal connection between the individual defendants who played a role in his transfer and Maddox's lawsuit against other, unrelated DOC employees, the court will grant defendants' motion for summary judgment.

UNDISPUTED FACTS[1]

**I. The Parties**

From August 2001 until October, 21, 2008, plaintiff Cornelius Maddox was incarcerated at the Green Bay Correctional Institution ("GCBI"). On October 21, 2008, Maddox was transferred to Wisconsin Secure Program Facility General Population ("WSPF-GP") and remained there until January 27, 2010, at which point he was transferred to Stanley Correctional Institution, where he currently resides.

Defendant Peter Ericksen is currently, and was for all times relevant to this lawsuit, employed as the Security Director at GBCI. At all times relevant to this matter, Mark Stutleen was employed as a Supervising Officer 1 (Lieutenant) at GBCI. Wendy Bruns is currently, and was for all relevant times, employed as an Offender Classification Specialist at GCBI. Dennis Mosher is currently, and was for all relevant times, employed as Institution Social Services Director at GCBI. At all times relevant to this lawsuit, Maleah Cummings and Maria Amarante were employed as psychologists at GBCI. As part of their respective responsibilities, defendants Bruns, Stutleen, Mosher were members of the Program Review Committee ("PRC"). The PRC is an administrative body designated to evaluate and recommend inmate classification assignments and transfers.

---

[1] The court finds the following facts taken from the parties proposed findings of fact to be material and undisputed.

**II. Maddox's 2008 Lawsuit**

On June 17, 2008, Maddox filed a lawsuit in the Eastern District of Wisconsin against GCBI Warden William Pollard and Health Services Manager Jeanne Greenwood, as well as a dentist, dental hygienist and nurse, alleging inadequate dental care at GBCI. *Maddox v. Jones*, No. 08-cv-521 (E.D. Wis. June 17, 2008). In a decision dated September 8, 2008, plaintiff was granted leave to proceed against the dentist, dental hygienist and nurse. *Maddox v. Jones*, No. 08-cv-52 (E.D. Wis. Sept. 8, 2008) (dkt. #9). While Maddox's claims against Pollard and Greenwood were initially dismissed, that portion of the decision was subsequently vacated and Greenwood and Pollard were reinstated as defendants in an order dated October 8, 2008. *Maddox v. Jones*, No. 08-cv-521 (E.D. Wis. Oct. 8, 2008) (dkt. #20).

None of the defendants in the Eastern District of Wisconsin action were named as defendants in the June 2008 lawsuit. The three current defendants who actually participated as members of GBCI's Program Review Committee in the decision to transfer Maddox -- Mosher, Stutleen, and Bruns -- do not recall knowing or Maddox personally telling them that he filed a lawsuit against other DOC employees at GBCI. Maddox disputes this, pointing to the October 2008 PRC hearing notes, which indicate that Maddox expressed the belief that his transfer was in retaliation for his filing the dental care lawsuit and an earlier lawsuit against WSPF. (*See infra* Undisputed Facts, part V.) Cummings similarly does not recall Maddox mentioning his 2008 lawsuit, though her notes reflect that Maddox mentioned an earlier lawsuit against WSPF.

**III. Transfer Process**

Pursuant to Wisconsin Administrative Code DOC § 302.19, a correctional facility's security director may transfer an inmate to any facility authorized by the DOC according to program review procedures that include factors used in assigning a custody classification.[2] Typically, the security director makes a recommendation for possible transfer to WSPF.[3] A referral is then reviewed by psychological and health services to determine if there are any psychological or medical contraindications that would caution against transfer to WSPF. If the referral clears this hurdle, it is then sent to review by the central office. If the referral is approved by the central office, the social worker / PRC at the institution initiates the appropriate paperwork for transfer. At that stage, the PRC interviews the inmate being referred.[4]

---

[2] Defendants represent in their proposed findings of facts that "transfers are not unusual." While defendants cite to Mosher's Affidavit in support, he actually avers that "lateral transfers rarely occur unless as a trade, and/or requested by Security." (Affidavit of Daniel Mosher (dkt. #47) ¶ 10.) Instead, Mosher contends that it is not unusual for Security to make a referral for a lateral transfer. (*Id.* at ¶ 9.) In other words, as the court understands, when a lateral transfer is recommended, it is not unusual that Security is the impetus for such a move. Ericksen's affidavit states unambiguously that "[l]ateral transfers are not unusual." (Affidavit of Peter Ericksen (dkt. #49) ¶ 7.) The averments of Moser and Ericksen may appear, but are not necessarily, contradictory. Taken together, the court understands that lateral transfers are not, in and of themselves, "unusual," although they "rarely occur unless as a trade and/or requested by security." Regardless, the frequency of lateral transfers is not central to Maddox's retaliation claim.

[3] Maddox responds to this proposed fact and several others simply on the basis that he has "no personal knowledge" of the procedure. (*See e.g.*, Pl.'s Resp. to Defs.' PFOFs (dkt. #56) ¶¶15, 16, 17.) Maddox's lack of personal knowledge of a proposed fact is an inadequate basis to find a genuine dispute of a material fact.

[4] An inmate may waive his appearance. In this case, the PRC conducts a file review to make the transfer decision.

### IV. Maddox's July 2008 PRC Review

On July 31, 2008, Maddox was seen by the PRC for his regularly scheduled review. At that review, Maddox requested "custody reduction" with an accompanying transfer to Oshkosh Correctional Institution or Racine Correctional Institution. In the alternative, if retained at maximum custody, Maddox requested a transfer to another maximum security site. The PRC determined that, based on Maddox's behavior since his last review, continued maximum-security level monitoring was warranted and that there was not a sufficient justification for a "lateral transfer" to another maximum security facility, at that time.[5]

### V.   Maddox's Transfer to WSPF

In response to bed management issues in certain DOC facilities, the Division of Adult Institutions reallocated 50 WSPF beds to the maximum security general population, effective September 3, 2008. Due to the availability of these beds, defendants represent that "it is likely classification and institution staff was asked to refer inmates from their GP units who may be suitable for transfer to WSPF-GP." (Defs.' PFOFs (dkt. #42) ¶ 28 (citing Affidavit of Mark Heise ("Heise Aff.") (dkt. #46) ¶ 18).)

---

[5] Maddox would dispute this fact, stating "Maddox's behavior since his last review." (Pl.'s Resp. to Defs.' PFOFs (dkt. #59) ¶ 23.) The court assumes that Maddox wishes to dispute that his behavior since his last review justified the PRC's decision to deny him a transfer to a lower-security level facility. Maddox points to nothing *in the record* as support. Indeed, the committee comments from the July 31, 2008, review with Maddox indicate that Maddox had "received 3 minor, and a major CR for fighting" since his last review. (Affidavit of Wendy Bruns ("Bruns Aff."), Ex. A (dkt. #44-1) 3.) Regardless, this fact is not material to Maddox's retaliation claim for reasons explained in the opinion that follows.

On September 12, 2008, defendant Ericksen recommended Maddox be considered for a transfer to WSPF-GP. Ericksen avers that he does not specifically recall making this request, but acknowledges that Maddox's file confirms that he did so. (Ericksen Aff. (dkt. #44) ¶ 6.) Defendants treated this as a "lateral" transfer because both GCBI and WSPF are maximum security institutions.[6]

A psychological assessment for WSPF transfer was completed by Dr. Amarante, and signed on September 12, 2008.[7] Dr. Amarante concluded that there were "no clinical contraindication to transfer to WSPF" because Maddox "does not meet any of the specific WSPF exclusion criteria." (Cummings Aff., Ex. 100 (dkt. #45-1) 48.)

On October 6, 2008, Dr. Cummings saw Maddox in response to a request he had submitted to the psychological services unit ("PSU"). Her notes from that appointment provide:

---

[6] Maddox would also dispute this fact, arguing that "WSPF was not run as a normal so call[ed] maximum." (Pl.'s Resp. to Defs.' PFOFs (dkt. #56) ¶ 26.) Maddox is actually asserting WSPF is run at a higher-level of security than GCBI, even though both are *classified* as maximum security. Indeed, several of plaintiffs' proposed findings of fact concern additional restrictions to which Maddox was subject at WSPF-GP. (*See* Pl.'s PFOFs (dkt. #34) ¶¶ 12-16.) This, too, is addressed later in this opinion.

[7] Such evaluations are required before any inmate is placed at WSPF in light of certain limitations of the facility that may be difficult or even deleterious for those with particular mental health conditions. (Defs.' PFOFs (dkt. #42) ¶ 29.) Curiously, the evaluation was completed the same date as Ericksen's recommendation that Maddox be transferred to WSPF-GP. Furthermore, the evaluation itself states that Maddox was interviewed as part of the evaluation on September 7, 2008. (Affidavit of Maleah Cummings ("Cummings Aff."), Ex. A (dkt. #45-1) 47.) From this, it seems that Ericksen must have made the recommendation (or at least recommended a psychological evaluation be performed for possible transfer to WSPF-GP) sometime on or before September 7, 2008, even though the official form recommending Maddox for a transfer is dated September 12, 2008.

> Mr. Maddox stated that he was PRC'd to WSPF-GP last week and stated that he really does not want to go. He stated that he was WSPF from 1999-2001, and that he has a current lawsuit against them for AC status while he was there. He also reported that he has been seeing HSU for a possible kidney infection and that he has been "stressed" as a result of the possible transfer. Mr. Maddox also stated that he believes he was placed on this list for transfer due to retaliation.

(Cummings Aff., Ex. 100 (dkt. #45-1) 8.) Cummings again concluded that, while Maddox was "experiencing some situational stressors, there does not appear to be any clinical contradiction to transfer." (*Id.*) Maddox also reported to his social worker that he did not want to return to WSPF and that he believed the transfer was due to retaliation.

On October 9, 2008, the PRC, consisting of Stutleen, Bruns, and Mosher, held a hearing to review the transfer recommendation. According to the Inmate Classification Report, Maddox stated prior to the hearing that he did

> not want to return to WSPF, even though this placement would be in their GP unit. He was there from 01/12/00-07/19/01. . . . He states that he asked PRC to consider a lateral transfer to a different max this past July and was denied, citing 'lack of sufficient reason.' He would like to know what has occurred since that PRC to now make a lateral max transfer necessary.

(Mosher Aff., Ex. A (dkt. #47-1) 4.) Maddox also stated that he believes the transfer is in retaliation to a lawsuit filed against WSPF and one recently filed against GBCI. (*Id.*)

On the same date, the PRC cleared Maddox for transfer explaining:

> Last PRC 2 ½ months ago recommended further monitoring of behavior at current site and custody level. At that time inmate was informed that lateral transfers rarely occur unless as a trade, and/or requested by Security. This early recall is based on a referral from Security, to consider inmate for

7

> transfer to WSGP. PSU and HSU, along with DOC Central Office Psychiatrist, have reviewed inmate and no clinical or medical concerns were noted; therefore he is clear for transfer to WSPF/GP. There are no contraindications to such a transfer from a PRC standpoint. It is the understanding of the committee that the limitations on moving an inmate without court permission apply if there is an appeal relating to a federal habeas corpus petition pending in the 7th Circuit or the US Supreme Court. The documentation provided by the inmate, or the case #s cited by the Social Worker, do not appear to meet that criteria, and the committee finds no evidence that the proposed transfer is retaliatory in nature as alleged by inmate. 7/09 recall set at last PRC will be retained.

(Mosher Aff., Ex. A (dkt. #47-1) 4.)

Maddox appealed the October 9, 2008, classification decision to classification supervisor Angela Hansen, who affirmed the original decision, noting "Placement at WSPG is based on available DOC resources. There is no contraindication to placement at this site." (Heise Aff. (dkt. #46) ¶ 23.) Maddox disputes that this decision was based on "penological goals" and contends that it constituted "atypical deprivation contrary to ordinary general population from where he was transfer (GBCI)." (Pl.'s Resp. to Defs.' PFOFs (dkt. #59) ¶ 34.)

Maddox was transferred to WSPF-GP on October 21, 2008, and remained there until January 28, 2010.

OPINION

To prevail on his First Amendment retaliation claim, Maddox must show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First

Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012) (quoting *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)) (internal quotation marks omitted). If the plaintiff puts forth sufficient evidence as to these three elements to establish a prima facie case, the burden then shifts to the defendant to rebut the third element "by showing that [defendant's] conduct was not a necessary condition of the harm -- the harm would have occurred anyway." *Mays v. Springborn*, No. 11-2218, 2013 WL 2504964, at *2 (7th Cir. June 11, 2013) (quoting *Greene v. Doruff*, 660 F.3d 975, 980 (7th Cir. 2011); citing *Mt. Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)).

Defendants do not (nor could they) dispute that filing a lawsuit regarding conditions of confinement, such as Maddox's lawsuit against GCBI dentist, dental hygienist and nurse, is a protected activity under the First Amendment. (Defs.' Combined Opening Br. & Opp'n (dkt. #41) 6 n.1 (citing *Connick v.* Myers, 461 U.S. 138, 147 (1983)).) Defendants also acknowledge (as they must) that transferring an inmate to a different prison can form the basis of a First Amendment retaliation claim. (*Id.* (citing *Higgason v. Farley*, 83 F.3d 807, 810 (7th Cir. 1996).) Defendants contend, however, that Maddox has not established a prima facie case because he has failed to put forth any evidence that defendants in this lawsuit were even aware of Maddox's dental care lawsuit or, if aware, were motivated by the lawsuit in transferring to WSPF-GP. Instead, defendants contend that Maddox was laterally transferred to GCBI for legitimate reasons concerning bed management across the Department.

9

In support of his motion and in opposition to defendants' motion, Maddox rests his case solely on suspect timing; the filing of his lawsuit in June 2008; the PRC's rejection of his transfer request in July 2008; and a little over two months later, the decision to transfer Maddox to WSPF.[8] Based on this, Maddox argues that "the transfer was in order to retaliate against Maddox for exercising his constitutional rights." (Pl.'s Opening Br. (dkt. #33) 5; Affidavit of Cornelius Maddox (dkt. #57) ¶ 4 ("The timing within this transfer questionable based on the serving of the civil complaint and then the special referral request of the security director.").)

In response, defendants focus on the timing as well, arguing that if defendants wanted to transfer Maddox in retaliation for his filing of the complaint in June 2008, then they would not have rejected Maddox's original transfer request in July 2008. But service did not occur on defendants in that lawsuit until after the complaint was screened and allowed to go forward.[9] Moreover, the complaint was not screened until September 8, 2008, and a docket entry indicates that a copy of the screening order and the complaint were sent to GCBI Warden Pollard via U.S. Mail on that same date.

---

[8] The fact that Maddox requested a transfer to a different prison, albeit his first choice was to a lower-level security prison, shortly before his transfer to WSPF raises some question as to whether Maddox could demonstrate that his transfer to WSPF constituted an adverse action "likely to deter First Amendment activity in the future." *Gomez*, 680 F.3d at 866. Still, Maddox has put forth evidence -- namely, in the form of his own affidavit -- that his treatment at WSPF in that prison's general population was significantly more restricted than that at GCBI. Accordingly, the court's decision to grant summary judgment to defendants solely turns on the causation element.

[9] The court assumes that a docket entry of a new lawsuit alone on September 8 would not have been enough to tip off the DOC, the defendants in that case or their counsel, much less the named defendants in this suit, that Maddox was attempting to bring suit, but if DOC and its counsel have contrary information, the court would expect that to have been or be disclosed.

According to defendants' proposed facts, Ericksen formally initiated the transfer process by recommending Maddox for transfer four days later on September 12, 2008. Based on these dates alone, therefore, Pollard and other officials at GCBI -- possibly including the defendants in this action -- could have become aware of Maddox's lawsuit a few days before recommending his transfer.

There is an additional interesting timing coincidence that defendants fail to address. On October 8, 2008, Judge Griesbach vacated part of the screening order and reinstated Warden Pollard and HSU Manager Greenwood as defendants. The PRC met the following day on October 9, 2008, and approved Maddox for transfer.

Still, there is also the fact that Maddox's transfer process was begun on or before September 7, 2008, the date Dr. Amarante interviewed Maddox to evaluate his mental health for fitness to transfer to WSPF. Based on this, Maddox likely was at least recommended for transfer by security *before* the screening order for Maddox's 2008 lawsuit was issued.

Given that the actual timing of Maddox's transfer to WSPF-GP and significant developments in his dental health lawsuit ultimately occurred in the same, narrow period of time, the defendants' discussion of the timing -- focusing solely on the date Maddox filed his complaint -- is at best overly simplistic, although the facts and reasonable inferences from the facts as to the timing here probably cut against plaintiff. Even if this were not so, it is well-established that timing alone is not enough for Maddox's claim to survive summary judgment. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th

Cir. 2008) ("[M]ere temporal proximity is not enough to establish a genuine issue of material fact." (internal quotation omitted)).

In the end, overlapping timing is all Maddox can offer. There is *no* proof of cause and effect, either by proof the transfer was *initiated* only after his lawsuit or even that the defendants (who made the final transfer decision) were aware of the lawsuit until Maddox himself told them about it as part of his challenge to the transfer on retaliation grounds.[10] On the contrary, the record demonstrates that the DOC opened up 50 beds at WSPF-GP to address bed management issues at certain prisons nine days before Ericksen's "official" recommendation of Maddox's transfer.

Evidence of the actual defendants' initiating a transfer upon personal knowledge of a lawsuit or of a *pattern* of transferring inmates who had filed lawsuits might push this case past summary judgment, but no such evidence has been offered. Accordingly, Maddox failed to put forth sufficient evidence to demonstrate that his dental care lawsuit was a motivating factor in defendants' decision to transfer him to another prison. Even if he had met his burden, defendants have responded with evidence that the transfer was for a legitimate penological reason -- to address bed management issues -- and Maddox failed to "produce evidence upon which a rational finder of fact could infer that the

---

[10] Maddox's decision to advise defendants of his other lawsuit *as part of his challenge to the initial transfer decision* cannot by itself constitute proof of advance knowledge, not only because it is contradicted by the fact that the transfer decision had already been begun, but also because it would effectively give *inmates* veto power over all transfer decisions merely by bringing and giving notice of another lawsuit and then challenging any act.

defendant's proffered reason is a lie."  *Zellner v. Herrick*, 639 F.3d 371, 379 (7th Cir. 2011).  The court, therefore, will grant defendants' motion for summary judgment.[11]

## ORDER

IT IS ORDERED that:

1) Plaintiff Cornelius Maddox's motion for summary judgment (dkt. #32) is DENIED;

2) Defendants Peter Ericksen, Mark S. Stutleen, Wendy Bruns, Dennis Mosher, Maleah Cummings, and Maria Amarante's motion for summary judgment (dkt. #40) is GRANTED; and

3) The clerk of the court is directed to enter judgment in favor of defendants and close this case.

Entered this 24th day of July, 2013.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge

---

[11] Because of this decision, the court need not address defendants' argument concerning Dr. Cummings specifically.  (*See* Defs.' Combined Br. (dkt. #41) 9-10.)